## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

SPRING BORN, INC.,
a Colorado corporation,

      Plaintiff,

v

MASTRONARDI PRODUCE
LIMITED, an Ontario corporation,

      Defendants.

Case No.:  25-cv-
Hon.
Mag:

---

## COMPLAINT

Plaintiff, Spring Born, Inc. ("Spring Born"), through counsel Taft Stettinius & Hollister LLP, for its Complaint against Defendant, Mastronardi Produce Limited ("MPL"), states as follows:

## PARTIES, JURISDICTION, AND VENUE

1.     Spring Born is a Colorado corporation with its principal place of business in San Francisco, California. As such, Spring Born is a citizen of Colorado and California for purposes of 28 U.S.C. § 1332.

2.     MPL is a corporation organized and existing under the laws of the Province of Ontario, Canada, with its principal place of business at 2100 Road 4 East, Kingsville, Ontario, Canada N9T 2E5. As such, MPL is a citizen of the Province of Ontario, Canada.

3.     This Court has subject matter jurisdiction over this matter under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interests and costs, and because there exists complete diversity of citizenship between the parties because Spring Born is a citizen of the States of Colorado and California, and MPL is a citizen of the Province of Ontario, Canada.

4.     This Court has personal jurisdiction over MPL because, among other things, under the Agreement, MPL "irrevocably consent[ed] to [] personal jurisdiction" in Michigan. **Exhibit 1**, Agreement at ¶ 19.

5.     Additionally, MPL regularly conducts business in the United States, including in Michigan, where it maintains a corporate office in Livonia, Michigan, by marketing, selling, and distributing its greenhouse-grown produce to customers located in Michigan and elsewhere in the United States, thereby transacting business within Michigan under the state's long-arm statute, Mich. Comp. Laws § 600.715, and purposefully availing itself of the privilege of conducting activities in Michigan so that it has established sufficient minimum contacts with this forum and could reasonably anticipate being haled into court here consistent with due process.

6.     Venue is proper in this judicial district because the Agreement provides that "[a]ny legal action or proceeding arising under [the] Agreement will be brought in the state and federal courts located in the Eastern District of Michigan," to which MPL "irrevocably consent[ed]," **Exhibit 1**, Agreement at ¶ 19, thereby selecting this

District as the exclusive contractual forum for disputes arising under the Agreement and waiving any objection to venue here.

7.     Venue is also proper in this judicial district under 28 U.S.C. § 1391(b)(2) because, consistent with the parties' Agreement selecting the Eastern District of Michigan as the forum for disputes arising under the Agreement, a substantial part of the events or omissions giving rise to this claim are tied to MPL's performance and obligations under the Agreement as administered through its United States operations, including its Michigan presence.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### The Parties

8.     Spring Born owned and operated an indoor, climate-controlled produce facility (the "Greenhouse") in western Colorado that grew, packaged, and distributed leafy greens (including lettuces and salad blends) using hydroponic and automated production methods for sale to customers nationwide.

9.     Its principal shareholder is Charles Barr.

10.    MPL is a fourth-generation, family-owned greenhouse grower, marketer, and distributor of fresh produce that operates throughout North America under the SUNSET®, Backyard Farms®, BerryWorld®, and Queen of Greens™ brands, supplying tomatoes, cucumbers, peppers, berries, and leafy greens to retail and foodservice customers year-round.

3

11.     On information and belief, MPL is the largest producer and distributor of greenhouse-grown produce in North America.

***Spring Born's Initial Operations***

12.     Spring Born initially commenced operations at the Greenhouse in June 2021, and began commercial distribution of packaged leafy greens in October 2021.

13.     Spring Born did well at the outset, and generated a tremendous amount of goodwill.

14.     By December 2022, it had doubled its sales, and its customers included Whole Foods, several local grocery stores, and restaurants, and even a local school district.

15.     Spring Born was also onboarded with FreshPoint, a national food-service distribution company affiliated with Sysco that warehouses and delivers food and related products to restaurants and other commercial customers, allowing Spring Born's products to be offered through Sysco's distribution network.

16.     However, Spring Born was having difficulty getting national retailers to carry its products.

17.     Also in December 2022, Spring Born lost its next round of financing.

18.     These factors forced Spring Born to close the Greenhouse at the end 2022.

195338791v5

***MPL Induces Spring Born to Restart Operations Through False Claims of Existing Orders and Market-Price Purchases***

19.     Around the same time that Spring Born was winding down its operations, MPL approached Spring Born with a proposal to restart its operations.

20.     MPL represented to Spring Born that MPL had an immediate need for a large volume of 4-ounce packaged organic lettuce suitable for retail sales, and that MPL would be interested in a long-term exclusive contract to buy Spring Born's entire production of that product at "market price."

21.     On December 16, 2022, Dean Taylor (MPL's then Vice President of Business Development) had a phone conversation with Jake Stanello (Spring Born's Operations Manager) and Barr in connection with scheduling an in-person meeting to negotiate a contract between the parties.

22.     During that December 16, 2022 phone conversation between Taylor and Stanello, Taylor represented that MPL was short 35,000 cases per week of 4-ounce packaged lettuce for delivery on its existing orders and was looking for a grower to fill that gap.

23.     That same day, Taylor, who oversaw greenhouse contracts for MPL, sent an email to Barr whereby MPL represented that the market price it would pay SpringBorn under a proposed agreement was between $1.65 to $2.00 per 4-ounce package of lettuce.

5

24.    In that same email, Taylor explained that grower payments under an offtake agreement would be derived from these retail prices, less commission and freight. **Exhibit 2**, Email.

25.    According to Taylor, MPL was offering Spring Born a long term, 5-year exclusive deal for its entire production at "market price," which, according to Taylor, was $1.65 to $2.00 per 4-ounce package.

26.    To further the negotiation of a contract, Spring Born arranged for an in-person meeting between, its representatives, MPL representatives, and representatives of its lender, Greater Nevada Credit Union ("Greater Nevada"), from whom Spring Born was seeking a $2 million loan needed to re-start operations at the Greenhouse.

27.    This meeting took place at Spring Born's Colorado facility on January 16, 2023.

28.    Lisa Siesennop attended on behalf of Greater Nevada.

29.    Barr and Stanello attended from Spring Born.

30.    Dean Taylor (Vice President of Business Development), Paul Mastronardi (CEO), Chris Gill (Director of Greenhouse Operations), and Jason Bucko (Senior Vice President, Sales) attended from MPL.

31.    At that meeting, Taylor told Barr that MPL was actually short 40,000 cases per week on its existing orders for 4-ounce packaged lettuce and repeated the

6

offer of a 5-year contract for Spring Born's entire production at "market price," which MPL understood was in the range of $1.65 to $2.00 per 4-ounce package based on Taylor's representations.

32.     Based on Barr and Stanello's knowledge and experience in the lettuce growing business, the range of prices shown on the document sent by Taylor on December 16, 2022, and his verbal statements during the January 16, 2023 meeting were consistent with the market price being paid to other growers for 4-ounce packaged lettuce.

33.     At the meeting, Siesennop told the MPL team that she was there to evaluate making the $2 million loan Spring Born needed to fund start-up costs.

34.     During the meeting, Paul Mastronardi told Siesennop that, "We [MPL] will buy everything that Spring Born can produce" and that, "We [MPL] have more orders for packaged lettuce than we can currently fill."

35.     Paul Mastronardi then told Siesennop that they were proposing a 5-year exclusive contract to buy all of Spring Born's production at "market price" of 4-ounce packaged lettuce, which Spring Born understood to mean $1.65 to $2.00 per 4-ounce package of lettuce based on Taylor's prior representations.

36.     Paul Mastronardi also told Siesennop (in the presence of Stanello and Barr) that MPL had existing contracts with buyers like Whole Foods to take Spring Born's entire production as soon as the facility could be restarted, and that there was

urgency to the loan request as MPL needed product to fill their existing orders for 4-ounce packaged lettuce as quickly as possible.

37.    At the same meeting, Paul Mastronardi also asked Siesennop about the availability of an additional loan beyond the $2 million to fund start-up costs for the expansion of the Greenhouse to add additional production capacity beyond the existing production capacity.

38.    Siesennop told the MPL team that she needed to create a financial model to show that the loan to reopen the Greenhouse was economically viable.

39.    As such, Siesennop asked MPL to confirm the "market price" that it was paying other lettuce growers and that it would pay to Spring Born under the proposed contract so that Siesennop could include that pricing in her financial model.

40.    In response to Siesennop's request, and in the presence of the entire MPL team that attended the meeting, Taylor opened his laptop to show Siesennop, Barr, and Stanello pay statements issued by MPL for another lettuce grower so that Siesennop, Barr and Stanello could see that MPL was paying between $1.65 to $2 per 4-ounce package, which equates to approximately $7.50 to $8.00 per pound of lettuce. The pay statement also showed a total weekly payment exceeding one hundred thousand dollars.

195338791v5

41.    Barr and Stanello were at this meeting and saw the pay statements that Taylor showed to Siesennop and heard the representations made by Taylor as to the "market price" that MPL would pay Spring Born under the proposed agreement, which Spring Born understood to be $1.65 to $2.00 per 4-ounce package based on Taylor's prior representations.

42.    Taylor made these verbal statements referenced above, and sent the December 16, 2022 email, and showed Siesennop, Stanello, and Barr the pay statements on his laptop (and in the presence of the entire MPL team) with the knowledge and intent that Siesennop, Stanello, and Barr would rely upon these representations as to the "market price" ($1.65 to $2.00 per 4-ounce package) that MPL would pay to Spring Born under the proposed contract so that (i) MPL would borrow the $2 million needed to restart operations and (ii) enter into the contract with MPL.

43.    Taylor's verbal statements and the documents he showed to Siesennop, Stanello, and Barr at the meeting were consistent with the pricing that Taylor had given to, in writing, Barr on December 16, 2022 and verbally given to Barr at the January 16, 2023 meeting.

44.    Based on MPL's representations about the price it was paying other growers and would pay to Spring Born under the contract, the 5-year model that Siesennop created showed that that the loan was economically viable.  As a result,

Greater Nevada approved the $2 million loan so that Spring Born could restart its operations.

45.     Spring Born in fact took out the $2 million and used the funds to restart its operations to be able to perform its obligations under the Agreement.

**_The Parties Enter into the Agreement_**

46.     Spring Born and MPL entered into the Agreement, which was effective February 2, 2023. The product intended to be covered by the Agreement was 4-ounce packaged lettuce.

47.     Pursuant to the terms of the Agreement, Spring Born agreed "to cultivate, grow, harvest, produce, and sell certain types and quantities of Products" and MPL agreed "to purchase certain types and quantities of Products from [Spring Born]" in accordance with the terms and conditions of the Contract. **Exhibit** 1, Agreement at § 1.1.

48.     The Agreement had an initial term of five years, running from March 15, 2023. **Exhibit** 1, Agreement at § 14.2 and Addendum I.A.

49.     Pursuant to the Agreement, Spring Born had to use 100% of its production capacity at the Greenhouse exclusively for MPL's benefit. This includes all growing, harvesting, packaging, and warehousing operations. **Exhibit 1**, Agreement at § 2.1.

195338791v5

50.     The Agreement further prohibits Spring Born from selling or marketing any products outside of MPL's distribution channels. **Exhibit 1**, Agreement at § 2.2.

51.     MPL's purchase commitments were tied to mutually planned forecasts and pack schedules that it controls in key respects (approval of varieties, product specs, crop timing, and interplanting).  If Spring Born's deliveries deviated by more than ±10% from any applicable forecast or pack schedule, MPL could convert any set prices to open-market pricing and deem the off-forecast volume "non-conforming," with Spring Born responsible for resulting cover or supplemental-product costs. **Exhibit 1**, Agreement at § 3.

52.     Under the Agreement, MPL set the price for products using an "open price" model based on prevailing market conditions. **Exhibit 1**, Agreement at § 5. MPL was supposed to pay Spring Born the gross sale price minus a 10% marketing fee and all distribution and logistics costs incurred by MPL.

53.     Relevant here, MPL agreed as follows with respect to obtaining "market prices":

> Mastronardi will, except as specifically set forth in this Agreement (including any Schedules, Exhibits or Addendums) and ***subject to Mastronardi's reasonable business judgment, use commercially reasonable efforts to endeavor to obtain market prices for the Quality Products that are consistent with the best and highest prices available on average over the duration of the applicable growing season, based upon and subject to seasonality, prevailing market conditions and customer***

11

*commitments at the time and location of sale*. [**Exhibit 1**,
Agreement at § 5 (emphasis added).]

54.    Importantly, the Agreement does not contain an integration or merger clause, and it also does not contain a clause limiting damages available to Spring Born.

55.    As such, and consistent with the verbal and written statements and representations made by MPL referenced above, which were intended to define the parameters of the "market price" to be paid Spring Born under the Agreement, the "market price" under the Agreement was intended to be within the range of $1.65 to $2.00 per 4-ounce package.

56.    Spring Born relied upon these representations and entered into the Agreement based upon MPL's representations that the term "market price" was intended to be within the range of $1.65 to $2.00 per 4-ounce package.  Spring Born further relied upon these representations and borrowed the $2 million needed to restart its production operations.

57.    Additionally, the Agreement is a contract for the sale of goods (packaged leafy greens and related produce) and is therefore governed by Article 2 of the Michigan Uniform Commercial Code ("UCC"), Mich. Comp. Laws. § 440.2101, *et seq.*

58.    Under Mich. Comp. Laws. § 440.1304, every contract or duty within the UCC imposes an obligation of good faith in its performance and enforcement,

195338791v5

and under Mich. Comp. Laws. § 440.2103 and Mich. Comp. Laws. § 440.1201, MPL, as a merchant buyer, was required to exercise honesty in fact and observe reasonable commercial standards of fair dealing in the trade when setting prices and exercising its contractual discretion.

59.     Under Mich. Comp. Laws. § 440.1303, a course of performance, course of dealing, and usage of trade are relevant in ascertaining the meaning of the parties' agreement and may give particular meaning to specific terms and supplement or qualify the terms of the agreement. In this industry, including MPL's dealings with other greenhouse lettuce growers, the prevailing market practice was to use net prices paid to growers (in this case, between $1.65 to $2.00 per 4-ounce package for packaged organic lettuce during the relevant period as represented by Taylor), and this practice informed the parties' shared understanding of "market price" under the Agreement.

60.     Moreover, under Mich. Comp. Laws. § 440.2202(a) and Mich. Comp. Laws. § 440.1303, evidence of course of dealing, usage of trade, and course of performance is admissible to explain and supplement the Agreement's terms, including "market price," even if the Agreement is treated as a final written expression, which it is not in this instance because the Agreement lacks a merger/integration clause.

13

*After Inducing Spring Born to Restart Operations with False Assurances of Existing 4-Ounce Packaged Lettuce Orders, MPL Pays Only Pennies on the Dollar for 3-Pound Food-Service Bags Sold as a Replacement, Driving Spring Born into Collapse*

61.    MPL requested that Spring Born commence operations as quickly as possible and to begin production at full capacity (18 production lines).

62.    Spring Born complied and, in early 2023, restarted operations at full capacity under the Agreement, dedicating all 18 production lines to growing the 4-ounce packaged lettuce products the parties had contemplated.

63.    Spring Born grew the organic lettuce blends MPL specified for the 4-ounce packaged product line.

64.    However, Spring Born could not begin packaging and shipping 4-ounce packages because MPL's designated packaging vendor, which was responsible for supplying branded packaging materials, could not deliver those materials for approximately six weeks.

65.    To avoid wasting the lettuce already produced, Barr and Taylor agreed that, until the branded 4-ounce packaging became available, MPL would sell Spring Born's lettuce to food-service customers in 3-pound bags as a temporary replacement channel.

66.    MPL represented that it had existing, longstanding relationships with major food-service distributors, including Sysco, who could absorb this interim 3-pound bagged product.

14

67.     Spring Born likewise had food-service relationships and understood that the market price paid to growers for a box of comparable food-service lettuce was approximately $12.00 per box.

68.     Spring Born's first payment from MPL for this food-service product was at a rate of 45 cents per pound (approximately $1.50 per box), a tiny fraction of both the prevailing food-service market price and the $1.65 to $2.00 per 4-ounce package range MPL had represented it would pay Spring Born.

69.     Subsequent payments for the 3-pound food-service lettuce bags ranged between 3 cents and 48 cents per pound, which was far below Spring Born's production costs and irreconcilable with the "market price" concept as represented and as used in the Agreement.

70.     MPL never contended that Spring Born's lettuce failed to meet quality standards.

71.     During this period, lettuce prices remained generally stable and there were no market-wide disruptions, such as a crash in prices, drought, or significant over-supply, which would explain MPL paying Spring Born only pennies on the dollar.

72.     Indeed, the market price today for packaged lettuce paid to growers exceeds $2.00 per 4-ounce package of lettuce.

15

73.     At the same time MPL was paying Spring Born far below the represented "market price," MPL was not placing orders for 4-ounce packaged lettuce as it had represented it needed to fill its existing orders.

74.     Ultimately, MPL admitted to Spring Born that MPL did not, in fact, have customer contracts or purchase orders in place for the lettuce it was purchasing from Spring Born and had merely hoped it could secure such contracts.

75.     MPL's admission that it lacked the existing customer orders and contracts it had repeatedly described was flatly inconsistent with, and exposed the falsity of, its earlier representations about its 35,000–40,000 case-per-week shortfall on existing orders and its ability and intent to pay the 1.65 to 2.00 dollars per 4-ounce package "market price."

76.     Because MPL lacked the customer base it had represented for both retail 4-ounce packages and the interim 3-pound food-service bags, it apparently diverted Spring Born's product into a "terminal market," where it sold for the low prices discussed above.

77.     As a result, Spring Born was forced to operate at full capacity exclusively for MPL while MPL (a) failed to obtain or utilize the retail and food-service channels it had touted, and (b) used its unilateral pricing discretion to pay Spring Born far below the represented "market price" range and far below any reasonable market price at the time for delivery.

78.     Unable to sustain operations at the prices MPL was paying—prices that were far below both the Agreement's "market price" obligation and Spring Born's cost of production—Spring Born ceased production after just five months, and its business collapsed as a direct and foreseeable result of MPL's conduct.

## COUNT I – FRAUDULENT INDUCEMENT

79.     Spring Born repeats and realleges the allegations in contained in the preceding paragraphs as if fully set forth herein.

80.     MPL made material representations to induce Spring Born to enter into the Agreement.

81.     Specifically, as detailed above, on December 16, 2022, MPL, through Taylor, represented that it was short 35,000 cases per week of packaged lettuce for delivery on its existing orders and was looking for a grower to fill that gap

82.     On December 16, 2022, MPL, through Taylor, also represented that it would pay Spring Born the "market price" on packaged lettuce, which MPL represented was $1.65 to $2.00 per 4-ounce package.

83.     At an in-person meeting on January 16, 2023, Taylor told Barr that MPL was actually short 40,000 cases per week on existing orders for packaged lettuce at the range of $1.65 to $2.00 per 4-ounce package, and repeated the offer of a 5-year contract for Spring Born's entire production at market price ($1.65 to $2.00 per 4-ounce package range).

17

84. At the same January 16, 2023 meeting, Paul Mastronardi, MPL's CEO, told Greater Nevada's representative (Siesennop) that MPL had "more orders for packaged lettuce than we can currently fill"; that MPL was proposing a 5-year exclusive contract for MPL to buy all of Spring Born's production at "market price"; and, that MPL had existing contracts with buyers like Whole Foods so that MPL could take all of Spring Born's production as soon as the Greenhouse could be restarted.

85. Additionally, at this meeting January 16, 2023 meeting, when Siesennop asked MPL to confirm the market price that it was paying other lettuce growers so that Siesennop could determine whether the loan Spring Born was requesting was economically viable, Taylor showed Siesennop pay statements MPL claimed to have issued to another lettuce grower, which confirmed that Mastronardi was paying between $1.65 to $2.00 per 4-ounce package.

86. These aforementioned representations were false – or, at a minimum, MPL made them with reckless disregard for their truth – and MPL concealed from Spring Born that it in fact lacked existing customer contracts or purchase orders necessary to support payment of the represented $1.65 to $2.00 per 4-ounce package market prices or alternatively, that it had utilized product from other growers besides Spring Born to fill the needs of its existing orders rather than honoring that pricing for Spring Born.

18

195338791v5

87.     MPL made these representations intending that Spring Born would rely on them by (i) entering into the Agreement and (ii) borrowing the $2 million needed to restart the grow operations, and intending to shift to Spring Born a risk – the claimed absence of an adequate customer base to purchase the lettuce at the represented market prices ($1.65 to $2.00 per 4-ounce package) – that Spring Born did not bargain for and would not have accepted had MPL been truthful.

88.     Spring Born relied on these representations when it took out a $2 million loan to restart operations, and did in fact re-start operations at full capacity per MPL's request, dedicating its entire production to MPL under the Agreement. Spring Born further relied upon these representations by entering into the Agreement.

89.     But for MPL's representations regarding its 35,000 to 40,000 case-per-week supply shortfall on existing orders, for which the market price it would pay Spring Born was between $1.65 to $2.00 per 4-ounce package, Spring Born would not have entered into the Agreement and would not have borrowed the $2 million needed to restart its grow operations.

90.     In entering into the Agreement and borrowing the $2 million needed to restart operations, Spring Born agreed to assume only the ordinary commercial risk that market prices for packaged organic lettuce might fluctuate within the $1.65 to $2.00 per 4-ounce package range that MPL represented it would pay, and it did so

19

based on MPL's representation that it already had existing orders and customers to purchase Spring Born's production at those market prices.

91.     Spring Born did not, and would not, knowingly assume the fundamentally different risk that MPL had no existing customers or contracts capable of supporting those represented prices, because had MPL disclosed that it lacked such customers and orders, Spring Born would not have taken on $2 million in new debt, would not have restarted the Greenhouse, and would not have agreed to dedicate 100% of its production capacity exclusively to MPL.

92.     As direct result of MPL's misrepresentation, and as reflected in the pennies-on-the-dollar payments it made for Spring Born's replacement, 3-pound food-service bags, Spring Born was placed in an untenable position it never agreed to accept – producing exclusively for MPL at full capacity while MPL lacked the existing customer orders for 4-ounce packaged lettuce MPL told Spring Born it had and diverted the replacement food-service product into secondary or terminal markets at distressed prices. This left Spring Born exposed to losses arising from MPL's undisclosed lack of customers rather than from any normal market-price fluctuation risk that Spring Born had agreed to bear.

93.     Spring Born has been damaged by MPL's actions by an amount in excess of $75,000 exclusive of interest, costs and attorney fees, to be determined at trial, including, but not limited to, lost revenues and profits it reasonably expected

under the Agreement for the life of its production facility, or alternatively five years, plus costs and expenses incurred to restart and continue operations in reliance on MPL's representations including the full $2 million loan amount borrowed to restart production, increased financing and carrying costs, and other consequential, and reliance damages proximately caused by MPL's misconduct and breaches.

## COUNT II – BREACH OF CONTRACT

94.     Spring Born repeats and realleges the allegations in contained in the preceding paragraphs as if fully set forth herein.

95.     Spring Born and MPL entered into a valid and enforceable contract under which Spring Born would dedicate and supply its greenhouse-grown packaged leafy greens solely to MPL, and MPL would purchase such products from Spring Born at "market" pricing and through MPL's distribution channels, including purchasing the 4-ounce packaged lettuce products that were the focus of the parties' Agreement.

96.     As set forth in paragraph 52 above, under the parties' agreement, MPL was obligated to "*use commercially reasonable efforts to endeavor to obtain market prices for the Quality Products that are consistent with the best and highest prices available on average over the duration of the applicable growing season, based upon and subject to seasonality, prevailing market conditions and customer*

21

*commitments at the time and location of sale*." **Exhibit 1**, Agreement at § 5 (emphasis added)

97.     As used within this paragraph, the phrase "market prices" was intended to mean the range of $1.65 to $2.00 per 4-ounce package as represented by Taylor and Paul Mastronardi, as described above, based on current market conditions existing at the time of the Agreement subject to normal seasonal variation, and, at a minimum, to reflect the "reasonable price at the time for delivery" required by Mich. Comp. Laws. § 440.2305 where a buyer with an open price term fixes price in good faith.

98.     As used in this paragraph, the terms "reasonable business judgment" and "commercially reasonable efforts" were included in the Agreement based upon the representations made by Taylor and Mastronardi to Spring Born described above, including the representations that MPL was short between 35,000 to 40,000 cases on existing orders for product at the range of $1.65 to $2.00 per 4-ounce package, such that MPL's "reasonable business judgment" and "commercially reasonable efforts" would apply to MPL's selection of the "best and highest" prices available from these existing orders in the $1.65 to $2.00 per 4-ounce package range and did not contemplate MPL using the product from growers other than Spring Born to fill existing orders for product in the $1.65 to $2.00 per 4-ounce package range or "dumping" Spring Born's product at terminal markets for pennies, and, at a

22

minimum, the phrase "market prices" was required to reflect a reasonable price at the time for delivery as required by Mich. Comp. Laws. § 440.2305 where a buyer with an open price term fixes price in good faith.

99.   Under Michigan law, every contract contains an implied covenant of good faith and fair dealing that prohibits a party from exercising its contractual discretion in a way that destroys or injures the other party's right to receive the fruits of the contract.

100.   To the extent that the Agreement left any of the performance terms, including, without limitation, the determination of "market prices," the manner in which MPL would exercise its purchasing and forecasting discretion, the use of commercially reasonable efforts, or and the way MPL would use its distribution relationships to place Spring Born's product, solely within MPL's control, MPL was prohibited from exercising that discretion in a manner that destroyed or harmed Spring Born' right to receive the fruits of the contract.

101.   Because the Agreement is a contract for the sale of goods between merchants, it is governed by Article 2 of the Michigan UCC. Under Mich. Comp. Laws. § 440.1304, every contract and duty within the UCC imposes an obligation of good faith in its performance and enforcement. Under Mich. Comp. Laws. § 440.2103 and Mich. Comp. Laws. § 440.1201, MPL, as a merchant buyer of goods, was required to act with honesty in fact and to observe reasonable commercial

23

standards of fair dealing in the trade in exercising its pricing, forecasting, and purchasing discretion under the Agreement.

102.   The Agreement's "open price" structure, under which MPL unilaterally set the price "based on prevailing market conditions," constitutes an "open price term" within the meaning of Mich. Comp. Laws. § 440.2305(1). Where, as here, the price is to be fixed by one party, Mich. Comp. Laws. § 440.2305(2) requires that such price be fixed in good faith, and if it is not, the applicable price is a reasonable price at the time of delivery.

103.   In addition, Mich. Comp. Laws. § 440.1303 allows course of performance, course of dealing, and usage of trade to explain or supplement the Agreement's terms, including the undefined "market prices" concept in Section 5 of the Agreement. Industry pricing, MPL's own pre-Agreement representations that it was paying other growers between $1.65 to $2.00 per 4-ounce package, and comparable grower contracts all reflect the relevant usage of trade and reasonable market pricing for Spring Born's products.

104.   Even if the Agreement is treated as a final written expression of certain terms, which it is not, Mich. Comp. Laws. § 440.2202 provides that such a writing may not be contradicted by prior or contemporaneous agreements, but may be explained or supplemented (a) by course of dealing, usage of trade, or course of performance, and (b) by consistent additional terms. Consistent with Mich. Comp.

24

Laws. § 440.1303 and Mich. Comp. Laws. § 440.2202(a), the parties' course of performance, their prior dealings, and the usage of trade reflected in MPL's own grower pricing and industry data may be used to explain and supplement the undefined "market prices," "reasonable business judgment," and "commercially reasonable efforts" terms in Section 5 of the Agreement without contradicting the written language.

105.   Although Spring Born restarted the Greenhouse at full capacity and grew the organic blends specified for the 4-ounce packaged lettuce products, MPL failed to place and purchase those 4-ounce packaged products as contemplated by the Agreement and instead diverted Spring Born's production into temporary 3-pound food-service bags sold at distressed prices.

106.   MPL breached the parties' Agreement and its UCC obligations. These breaches include without limitation: (a) failing to pay Spring Born "market price" for its product as required by the Agreement; (b) failing to use commercially reasonable efforts to obtain the "best and highest" prices for Spring Born's products; (c) failing to obtain market prices for Spring Born's products as that term was intended to be interpreted under the Agreement and as explained and supplemented by course of performance, usage of trade, and consistent additional terms under Mich. Comp. Laws. § 440.1303 and Mich. Comp. Laws. § 440.2202, and as required by Mich. Comp. Laws. § 440.2305(2), which obligated MPL to fix the open price

term in good faith and at a reasonable price at the time of delivery; (d) exercising its pricing, forecasting, and purchasing discretion in bad faith and not in a commercially reasonable manner, in violation of the implied covenant of good faith and fair dealing under Michigan common law and the UCC good-faith obligations in Mich. Comp. Laws. § 440.1304 and Mich. Comp. Laws. § 440.2103; (e) using its contractual discretion in a manner that destroyed Spring Born's right to receive the benefits of the Agreement; and, (f) failing to place and purchase the 4-ounce packaged lettuce products that were the central subject of the Agreement, despite requiring Spring Born to restart the Greenhouse at full capacity and dedicate its entire production to MPL for that 4-ounce packaged lettuce program.

107.  MPL's decision to pay only pennies on the dollar for Spring Born's 3-pound food-service bags and failing to place orders for the 4-ounce packaged lettuce for which it claimed to have existing contracts further breached its contractual and statutory duty to set prices in good faith and consistent with reasonable commercial standards of fair dealing in the trade.

108.  Spring Born has been damaged by MPL's breach of the Agreement by an amount in excess of $75,000, exclusive of interest, costs and attorneys fees to be proven at trial, including without limitation, lost revenues and profits it reasonably expected from the supply relationship over the full 5-year duration of the Agreement, costs and expenses incurred to restart and continue operations in reliance on MPL's

representations, increased financing and carrying costs, and other consequential, and reliance damages proximately caused by MPL's misconduct.

## COUNT III – INNOCENT MISREPRESENTATION

109.   Spring Born repeats and realleges the allegations in contained in the preceding paragraphs as if fully set forth herein.

110.   MPL made certain representations when it entered into the Agreement with Spring Born.

111.   On December 16, 2022, Taylor, acting on MPL's behalf, represented that MPL was short 35,000 cases per week of packaged lettuce on existing orders and that it needed a grower to help with the shortfall.

112.   On December 16, 2022, Taylor also represented that MPL would pay Spring Born the "market price" on packaged lettuce, which MPL represented was $1.65 to $2.00 per 4-ounce package of lettuce. MPL based this figure on what it was paying other similar growers for the same product.

113.   During an in-person meeting in January 2023, Taylor told Barr that MPL was actually short 40,000 cases per week on existing orders and reiterated MPL's offer of a 5-year contract for Spring Born's entire production at market price ($1.65 to $2.00 per 4-ounce package).

27

114.   On January 16, 2023, during a meeting between Spring Born, MPL, and Greater Nevada, MPL's CEO (Paul Mastronardi) told Greater Nevada's representative (Siesennop) that:

- MPL has "more orders for packaged lettuce than [it] can currently fill";

- MPL was proposing a 5-year exclusive contract for MPL to buy all of Spring Born's production at "market price"; and,

- MPL had existing contracts with buyers like Whole Foods so that MPL could take all of Spring Born's production as soon as the Greenhouse could be restarted.

115.   At this January 16, 2023 meeting, Siesennop asked MPL to confirm the market price that it was paying other lettuce growers so that Siesennop could determine whether the loan Spring Born was requesting was economically viable.

116.   In response to Siesennop's inquiry, Taylor showed her pay statements MPL issued to another lettuce grower, which confirmed that Mastronardi was paying between $1.65 to $2.00 per 4-ounce package.

117.   These representations were false.

118.   MPL eventually admitted that it did not ever have any contracts or purchase orders with customers for the lettuce it purchased from Spring Born. MPL was merely hopeful that it could get such contracts.

28

119.   Because MPL knew that it did not have contracts to sell Spring Born's lettuce, its representation that it would pay Spring Born "market price" (which it represented was between $1.65 to $2.00 per 4-ounce package) was similarly false.

120.   Spring Born relied on these representations, took out a $2 million loan to restart operations, and did in fact re-start operations.

121.   If MPL had never made these representations or had been honest about its lack of existing contracts, supply shortfall on existing orders, or the price it was willing to pay Spring Born, Spring Born would not have taken out the loan and resumed operations.

122.   MPL, the party that made these misrepresentations, was the one that benefited from them, including by getting Spring Born to restart operations, commit its production capacity to MPL, and take on the financing and operating costs required to supply the lettuce, while MPL itself had not secured retailer contracts or purchase orders and therefore avoided bearing that business risk.

123.   Spring Born has been damaged by MPL's actions by an amount in excess of $75,000 exclusive of interest, costs and attorney fees, to be determined at trial, including, but not limited to, lost revenues and profits it reasonably expected under the Agreement for the life of its production facility, or alternatively five years, plus costs and expenses incurred to restart and continue operations in reliance on MPL's representations including the full $2 million loan amount borrowed to restart

29

production, increased financing and carrying costs, and other consequential, and reliance damages proximately caused by MPL's misconduct and breaches.

## RELIEF REQUESTED

WHEREFORE, Plaintiff Spring Born, Inc. respectfully requests that this Court enter judgment in its favor and against Defendant Mastronardi Produce Limited, and award the following relief:

1.      Compensatory damages at an amount to be proven at trial in excess of $75,000 exclusive of interest and costs;

2.      Consequential and reliance damages in an amount to be proven at trial;

3.      Pre- and post-judgment interest as allowed by law;

4.      An award of costs and reasonable attorneys' fees as permitted by law or contract; and,

5.      Any such other relief as this Court deems just and equitable under the circumstances.

## <u>JURY DEMAND</u>

Plaintiff SpringBorn, Inc. through counsel firm name, hereby demands trial by jury on all issues so triable pursuant to Fed.R.Civ.P.38.

30

Respectfully submitted,

TAFT STETTINIUS & HOLLISTER LLP

*/s/ R. Christopher Cataldo*
R. Christopher Cataldo (P66473)
Vincent C. Sallan (P79888)
Attorneys for Plaintiff Spring Born, Inc.
27777 Franklin Road – Suite #2500
Southfield, MI  48034-8214
(248) 351-3000
ccataldo@taftlaw.com
vsallan@taftlaw.com

Dated:  December 31, 2025

31